ALBANY,
Feb. 1825.

The People
v.
Douglass.

## THE PEOPLE *against* DOUGLASS.

A jury, impannelled to try a prisoner upon an indictment for murder, were allowed to leave the court house during the trial, under the charge of two sworn constables; and having left the court house, two of them separated from their fellows, went to their lodgings, a distance of 30 rods, ate cakes, took some with them on their return, and drank spirituous liquor, though not enough to affect them in the least, and one of them conversed on the subject of the trial; they returned, heard the trial through, and joined in a verdict of guilty. *Held,* that the verdict should be set aside, and a new trial granted.

The mere separation of a jury, though impannelled to try a capital offence, and tho' they separate contrary to the directions of the court, will not, of itself, be a sufficient cause for setting aside the verdict:

But if there be the least suspicion of abuse, the verdict should be set aside.

AT the last Court of Oyer and Terminer in Steuben county, Douglass was convicted of murder. The trial commenced on the 11th of January, 1825. About 2 P. M. the jury had liberty to retire from the box, under the charge of two sworn constables, and the direction of the Court to keep together, and return speedily. This was before the trial had concluded. The jury retired to consider on their verdict about 11 P. M. and returned a verdict of guilty about 4 the next morning. After the conviction, a motion was made in the Court of Oyer and Terminer for a new trial, on the ground that two of the jurors, while out under the care of the constables, separated from their fellows, ate, drank whiskey, put cakes in their pockets, and conversed with bystanders on the subject of the trial. The prisoner was thereupon remanded, and the sentence respited till the next Court of Oyer and Terminer, with a view that the opinion of the Supreme Court might be taken. A certiorari was accordingly sued out, removing the cause to this Court; and the body of the prisoner being now brought up on *habeas corpus*, several affidavits were read touching the separation and conduct of the jury. From these it appeared that Lamb and Swartwout, two of the jurors, availed themselves of the liberty given them to retire, to separate from their fellows; that they ate at the jail, where they lodged during the session of the Court. The jail was about 30 rods from the court-house. They left their fellow jurors standing at and near the court-house. They obtained some cakes and immediately returned, and went into the court-house with the other jurors. Several of the deponents in behalf of the prisoner stated, that the two jurors also drank whiskey, while thus separated, and conversed with the bystanders on the subject of the trial; but Swartwout, whose affidavit was

read, denied that he drank whiskey while out, but did not say whether he drank any other spiritous liquor. He deposed that he did not converse on the subject of the trial, nor did he believe that Lamb conversed on that subject, in whose company he continued the whole time of their being out, except that he left Lamb standing at the front door of the jail, on his return, advanced 5 or 6 rods before him, turned and called to him, when he then immediately followed. He also stated circumstances which strongly negatived the charge that Lamb had drank any spiritous liquor, while out. The Attorney General read several affidavits, with a view to impeach the credibility of the persons who deposed to the facts of drinking and conversing, which were the only ones in dispute. But it is not necessary with a view to the points raised and decided, to state the evidence farther; except that the two jurors implicated were fully proved to be men of very fair characters, and in no wise affected by any spiritous liquor which they might have drank; and there was one of the witnesses, (Wheeler,) who swore that he saw these two jurors drink some kind of spiritous liquor, as he thought, while out. His veracity it was not attempted to impeach. No affidavit had been procured from Lamb, by reason that since the trial he had become insane in his mind.

*Z. A. Leland*, for the prisoner, now moved for a new trial. He insisted, 1st, that the act of separation, in the two jurors, from their fellows, and going out from the control of the officers, contrary to the instructions of the Court, was, of itself, a sufficient ground for setting aside the verdict. It is true, that this Court have denied this in civil cases. (*Smith* v. *Thompson*, 1 Cowen's Rep. 221. *Horton* v. *Horton*, 2 Cowen's Rep. 589. *Ex parte Hill*, 3 Cowen's Rep. 355.) But even in civil cases it is otherwise, if there be the slightest suspicion that the separation has been abused to the injury of the party moving. (*Horton* v. *Horton*, 2 Cowen's Rep. 589.) In capital cases, however, and trials for felony, the jury have never been allowed to depart from the care and control of the officer who has the charge of them, till they have agreed upon and pronounced their verdict; and if they

violate their duty in this respect, it is not merely a contempt of the Court, but also cause for setting aside the verdict. This was holden in the *Commonwealth* v. *M'Caul*, (Virginia Cases, 271,) stated at large in the Reporter's note to *Smith* v. *Thompson*, (1 Cowen's Rep. 235 to 237.) The distinction was there supported, by great strength of reasoning, both by the counsel and the Court. Mr. Wirt, for the prisoner, defied the Attorney General to produce a single case of life and death, in which a verdict was allowed to stand after a separation of the jury; and none was produced. Nelson, J. confines the right of separation to a case of inevitable necessity. The *King* v. *Wolf*, (1 Chit. Rep. 401,) also stated at large in 1 Cowen's Rep. 227 to 232, *note*, will probably be relied on; but that was the case of a misdemeanor, and the Judges proceeded upon this distinction. They also rely that no provision was made in England to refresh the jury at the public expense, and it is, therefore, necessary that they should separate and refresh themselves at their own expense. It is otherwise here. They are uniformly supplied with refreshments by the Sheriff, who may charge the county, and have his claim audited and allowed by the board of Supervisors, as one of the reasonable contingent charges of the county. He also cited *Wood* v. *Hart*, (3 Caines' Rep. 96,) *Dana* v. *Roberts*, (1 Root's Rep. 134,) and *Orcutt* v. *Carpenter*, (1 Tyler's Vermont Rep. 252.)

[SAVAGE, Ch. J. 'Tyler's Reports are not considered good authority, even in his own state.]

*Leland* also cited *Tweedy* v. *Brush*, (Kirby's Rep. 13,) *Thompson* v. *Mallet*, (2 Bay's Rep. 94,) and *Shepherd* v. *Baylor*, (2 South. Rep. 827.) In *The People* v. *M'Kay*, (18 John. 218,) Spencer, Ch. J. mentions the case of a new trial being granted merely because the jury had separated after finding a defendant guilty of murder.

The counsel then examined the weight of evidence as to the two jurors' having drank spiritous liquor, and conversed on the subject of the trial; and insisted, that even if this were a civil case, the verdict should be set aside.

*Talcott,* (Attorney General,) contra, would, in the first place, refer the Court to a few authorities, in addition to those collected by Cowen, in the note to *Smith* v. *Thompson.* These were *State* v. *Carstaphen,* (2 Hayw. 238,) *Clark* v. *Cole,* (1 Penn. Rep. 278,) *Butts* v. *Drake,* (2 Hayw. 102,) *Crane* v. *Sayre,* (1 Halst. Rep. 110,) *Goodright* v. *M'Causland et al.* (1 Yeates Rep. 372,) *Duke of Richmond* v. *Wise,* (1 Ventr. 125,) Jenk. 4 Cent. 187, Case 84. Only one of these, he said, was a criminal case—that of *State* v. *Carstaphen,* in 2 Haywood, which was perjury. He also cited Dy. 218, *a ;* Co. Litt. 227, *b ; King* v. *Burdett,* (12 Mod. 111) 2 Salk. 645, S. C ; 1 Ld. Raym. 148, S. C ; Br. Verdict, pl. 19. That the rule is the same in both civil and criminal cases, he relied on 1 Chit. C. L. 655, 643, 529, and 1 H. P. C. 306.

*The State* v. *Babcock,* (1 Con. Rep. 401,) was a case of murder ; yet a separation of the jury was held no cause for setting aside the verdict. It is the settled law of that state, that the jury may disperse and assemble at pleasure, under the direction of the Court, both while the trial is pending, and after cause is submitted. And in *The King* v. *Wolf et al.,* relied on by the counsel for the prisoner, Best, J. thinks the same latitude is allowable, both in civil and criminal cases. His opinion will be found in the note, (1 Cowen's Rep. 231,) where he puts the case of a capital felony, and makes the separation of the jury depend upon the same rule as a civil cause. He felt himself governed by no such distinction as is contended for on the other side. It is said, that in the *Commonwealth* v. *M'Caul,* Mr. Wirt challenged the production of a single case of life and death, in which the separation of the jury had not been held cause for setting the verdict aside. The answer is, that the counsel for the Commonwealth challenged Mr. Wirt to produce a single case where the distinction had been made. Both challenges remained equally unanswered. As to the case stated *arguendo* by the late Chief Justice, in 18 John. 218, it does not appear how long the jury had continued separate, nor what abuses might have been committed. That case was cited in reference to the question involved in the prin-

cipal case which was, whether a new trial could be award-ed for a capital felony, where the judgment had been arres-ted.　No case can be found at this day supporting the dis-tinction set up.　The *Commonwealth* v. *M'Caul*, finally proceeded upon principles applicable to all cases of jury trials.　Why should there be any distinction?　What is the object of empannelling a jury?　To speak the truth between the people and the prisoner, the parties in the cause, the same as in other cases.　It was once thought, that compari-son of hand writing was admissible evidence in civil, though not in criminal cases; but the moment it was brought to the test of principle, the distinction vanished. Truth is always the same, and the principles of justice are immutable and eternal.　If the verdict be fair and impar-tial, why not sustain it in all cases?　Shall a verdict, good in the case of a misdemeanor upon the ground that it is fair and impartial, be set aside, when the same ground exists, because it was rendered on an indictment for a felony?　Or will gentlemen say that you may condemn in case of a misdemeanor, though the verdict be tainted with influence or corruption?　If not, there is nothing in the distinction sought to be maintained.

The Attorney General examined the facts, and insisted, that all abuse in drinking spiritous liquor, and conversing on the subject of the trial, were disproved.

*J. C. Spencer*, in reply, also examined the evidence, which, he insisted, showed abuse, in conversing and drink-ing spiritous liquor.　At any rate, he said, it is plain that the two jurors not only ate, but took cakes with them to the jury room.　This enabled them, if perverse enough, to hold out and overpower their fellows.　What use is there in the oath of the constable or bailiff, to keep the jury without meat or drink, if a part are allowed to stuff their pockets with food, and thus fortify themselves, and weary and exhaust their fellows?　The *Commonwealth* v. *M'Caul* was a case of simple separation, yet the Court set aside the verdict, from the danger of collusion and tampering.　The language of *Nelson*, J. who delivered the opinion of the Court, is very emphatic, and directly applicable to this case.　He said,

ALBANY,
Feb. 1825.

The People
v.
Douglass.

" from the mode in which collusion and tampering are generally carried on, such circumstance is generally known to no person, except the one tampering and the person tampered with, or the persons between whom a conversation may be held, which might influence the verdict. If you question either of these persons on the subject, he must criminate, or declare himself innocent, and you lay before him an inducement not to give correct testimony. The old rule was, that the jury, on no occasion, should separate. I mentioned, (though it is with difficulty that the rule has been at all relaxed,) that it is relaxed only in cases of imperious, or perhaps unavoidable necessity. But by allowing that a jury may separate without necessity, and that their verdict shall stand, unless the party accused, who, in these cases, is in the custody of the law, can show that the jury not only have separated, but that they, or a member of it, has also been tampered with, or held communication on the subject; this great barrier against oppression may gradually be sapped and undermined, and the bulwark cannot long remain. Such a precedent would be productive of evils incalculable, and too great for the Court, by its decision, to allow a door to be opened for them. Every danger, and particularly in such a case as this, should be watched and opposed in the beginning. The court will preserve, 'with fear and jealousy,' and will not expose the trial by jury, in criminal cases, to such risk of contamination as arises from the affidavits in this case. If the Court hath, without necessity, suffered a juryman to go home without an officer, (which it would never do,) it would vitiate the verdict. There is as much danger from a juryman's separating without the act of the Court as if it had been done by such act. Although there might be, and probably was no tampering with any juryman in this case, yet, in a free country, in deciding a particular cause, the decision is to be according to general principles, as applied to that case : and more good will arise from persevering in the sacred principle involved in this case, than evil from granting a new trial, although, in this individual instance, a verdict has been given by 12 men, in fact unbiassed by the separation." (Vid. Cowen's Rep. 237, note.)

ALBANY,
Feb. 1825.

The People
v.
Douglass.

The great principle decided by this case is, that the door to abuse is not to be opened. The court are not to inquire into circumstances. It is enough that there is a possibility of abuse. This principle applies, with equal force, both to cases of misdemeanor and felony. The Attorney General produced a capital case from Connecticut, where simple separation was holden not to be a ground for setting aside a verdict. Swift, J. in that case, said, " as to the objection that the jury, after the cause was committed to them, were permitted to separate before they agreed on a verdict, it may be said that such has been the immemorial usage in this state, and the practice has been sanctioned by a decision of this Court ;" and in a note to that case, a decision is mentioned, which established the usage of jurors taking great latitude, as to separating, in all cases; and almost uncontrolled by the Court ; a state of things not at all applicable here ; but depending on the local usage of Connecticut, confessedly differing from the English common law. The Attorney General also cited *State* v. *Carstaphen*, (2 Hayw. 238,) which was a case of perjury, and asks, why should there be a difference in favor of felony, or even a capital felony ? We answer, because, in the latter case, the life of the accused is at stake. Society is about inflicting a punishment which can neither be recalled nor mitigated ; about *sending a human being into eternity.* This very circumstance admonishes to greater caution. This distinction is kept up in various other respects. Peremptory challenges are allowed to the accused. The form of administering the juror's oath is more solemn ; a plea in abatement, though overruled, results merely in a judgment of *respondeas ouster ;* while in a case of misdemeanor it is final. The rules of evidence, we agree with the Attorney General, must be the same in all cases ; but this does not reach the question before the Court, which is one as to the form—the guards which the law has imposed with a view to protect the life of the accused.

WOODWORTH, J. in delivering the opinion of the Court, spoke nearly as follows : The question whether a new tri

al is to be granted to the prisoner, will depend on the facts disclosed by the affidavits, as to the misconduct of the two jurors, Lamb and Swartwout. It is alleged, that they separated from their fellows, while the jury were out under the charge of the constables, and ate, drank spiritous liquor, and conversed on the subject of the trial. Anciently the utmost rigor and strictness were observed in the manner of keeping the jury ; and when once charged with a cause, they never could be discharged till they had agreed on their verdict ; but the practice has been much relaxed in modern times, in both these particulars. In *Parke's case*, (2 Roll's Rep. 85,) at *nisi prius*, a juror was challenged and withdrawn, and afterwards went out, mingled with the jury, and stayed with them above half an hour; but the Court held, that this should not set aside the verdict, unless it was shown that the jury had new evidence given after they went out of Court ; but that it was a misdemeanor in him who was challenged, and punishable.

On looking into the books, we do not find that mere separation of the jury has ever been held a sufficient cause for setting aside a verdict, either in a civil or criminal cause, if we except, perhaps, the case of the *Commonwealth* v. *M'-Caul*, (Virg. Cas. 271.) The question has been learnedly examined in several cases, and especially in that of *The King* v. *Wolf & others*, (1 Chit. Rep. 401.) That appears to be a case which excited very great interest, and led to the utmost research of the counsel, and the Court of King's Bench. It was ably argued, and all the Judges delivered their opinions *seriatim*. It was the case of a trial for a conspiracy, which commenced on the morning of the 20th of April, 1819, at Guildhall, before Abbot, Ch. J. and continued till 11 at night, when the evidence being closed on the part of the prosecution, but the case being unfinished, the Court informed the jury that they might retire to their families ; but especially warned them not to have any communication with any person, concerning the matter in issue. They retired accordingly, and the next morning assembled, heard the case through, and at a late hour in the afternoon found the defendants guilty. No abuse being pretended, the naked ques-

tion was presented, whether a separation, *per se*, was a sufficient ground for avoiding the verdict; and it was held, after great deliberation, that it was not. The Court admitted the ancient strictness which prevailed in this respect, but said it had been much relaxed; that it frequently became necessary, from the very great length of modern trials, that the jury should separate; that from the mere fatigue and exhaustion which jurors frequently undergo, it is a course not only essential to the rights of the public, but of mercy to defendants, whose causes must be unsafe in the hands of a jury entirely shut out from comfortable refreshment and relaxation, perhaps for several days. Best, J. in particular, speaks of the same rule being applicable to trials for the highest criminal offences. " Suppose (says he) in the case of a trial for capital felony, some of the jury, by accident, get out of the box, and the prisoner, in the result of the trial, is acquitted; the consequence of the argument for the prisoners would be a mis-trial, and the man must be put on his trial again." (1 Chit. Rep. 426.) What the King's Bench would have said of a capital case, it is true, does not directly appear; because the case under consideration was one of a misdemeanor. But the reasoning of the Judges is equally applicable to both cases; and we think that the mere fact of separation, unaccompanied with abuse, should not avoid the verdict, even in a capital case. A decision was cited to this effect from Connecticut; but we do not rely upon that, because the latitude allowed to jurors, in all respects, is there very great, and their Courts do not profess to be guided in this practice by the rules of the common law. The decisions in this country are not uniform. Several cases were cited on the argument from the New Jersey Reports, in which the separation of the jury was held irregular, but not sufficient to vitiate the verdict. These cases were not capital; but they go strongly to support the general principle. *State* v. *Carstaphen*, (2 Hayw. 238,) was a criminal case, and the same doctrine was holden. The case of the *Commonwealth* v. *M'Caul*, (Virg. Cas. 271,) does, however, go the length of saying, that the Court should guard against the possibility of abuse, by setting aside the verdict,

if any of the jury depart from the control of the officer; but the Court did not profess to go upon any adjudged case in England; and we think the English cases are founded on the better reason. These are uniform, that though the jury separate, if there be no farther abuse, this shall not vitiate the verdict though it would be a contempt of the Court, if contrary to their instructions, and would be punishable as such.

In the case at bar, the jury retired before the trial had closed, under the care of two sworn constables; and it is alleged, on the part of the prisoner, that two of them not only separated from their fellows, but also drank whiskey, and conversed freely on the subject of the trial.

Three of the witnesses, through whom it is sought to fix on Lamb and Swartwout the charge of having drank whiskey and conversed on the matter in issue, having deliberately contradicted what they had sworn as to conversations, I think they should not receive credit even for what they say in relation to the drinking of these jurors. Their testimony properly comes within the maxim, *falsus in uno, falsus in omnibus.* Besides, one of them is shown to have been a notorious drunkard himself. He was in a state of intoxication during most of the session, and at the very time when he pretends to have heard and seen things implicating the two jurors. But the case is very different with Wheeler, who thinks he saw both Swartwout and Lamb drink some kind of spiritous liquor while out. This witness stands unimpeached; and the exculpatory affidavit of Swartwout, one of the jurors, is not explicit. He confines himself to a literal denial that he drank *whiskey;* but Wheeler's affidavit that he drank some kind of spirits, may still be correct.

Admitting, however, that the weight of evidence is against drinking—admitting that Wheeler's and Swartwout's affidavits cannot be reconciled—I think that in a case of life and death, the question upon the misbehavior of the jury should be beyond all doubt. Clearly, we should disregard the fact of eating, as forming any ground for setting aside the verdict; for though this might be a contempt of Court, being without their leave, yet an opportunity to take

reasonable refreshments would always be granted, at a proper season; and the circumstance of their being obtained somewhat irregularly, could not prejudice the prisoner. But here the doubt is, whether there was not farther abuse, in drinking spiritous liquors. This should not be tolerated in any shape, in the jury, during the progress of the trial; and we have uniformly held, that it vitiated the verdict in a civil cause, even where the liquor was given to the jury by consent. It will not do to weigh and examine the quantity which may have been taken by the jury, nor the effect produced. In this case, it is not at all probable that either of these jurors was, in the least, under the influence of strong drink; but being doubtful whether they may not have drank something, we ought not, especially in a case of life and death, to sustain the verdict.

We cannot lay down any general rule for all cases like this which may arise. They will be attended with different circumstances. We do mean to be understood, however, as saying, that the mere separation of the jury, without any farther abuse, is not sufficient ground for setting aside a verdict; though it may deserve severe reprehension from the Court. In this case, we think there is not a total failure of proof that the two jurors drank, though perhaps the balance of evidence may be against it.

SUTHERLAND, J. I concur in the result of the opinion delivered. I do not think the evidence before us is to be weighed and balanced with the same nicety as would be proper in a civil cause. All we have to do, in a case like the present, is, to inquire whether, in the conduct of the jury, that prudence and circumspection has been observed, which becomes them on so solemn an occasion as that which commits to their hands the life of a fellow being. There is no difference among us, that the mere fact of drinking spiritous liquor is enough to set aside the verdict. It will never do to hold a rule short of this: that where any one of the jury, in the course of the trial, drinks spiritous liquor, we will set aside the verdict, on this ground alone. In this case, I think there is little doubt that two of the jurors did drink, though probably not in such quantities as in the least to disqualify them for a

discharge of their duty. Here are four witnesses who concur in the fact that the two jurors drank ; and none of them have ever contradicted themselves, as to this fact, in any subsequent conversation, though three of them have given statements at war with their affidavits, in other respects. Swartwout contents himself with denying that he drank *whiskey ;* but does not, and indeed could not in truth, deny this of his co-juror, Lamb ; though he might, if true, have done so with the same propriety that he denies Lamb's holding conversation with any one on the subject of the trial. As to the latter, he could not speak with absolute certainty. At one time he was six rods from Lamb, when he might have conversed unheard by Swartwout ; though if during the time of their separation he had his eye upon Lamb, he might have negated the fact of his drinking. He has not even gone so far as to say that he did not see Lamb drink. Though three of these witnesses have, subsequent to their making affidavits in behalf of the prisoner, contradicted themselves in relation to some of the material facts to which they swore, I do not think that, on this summary application addressed to the Court, we are warranted, in utterly rejecting their testimony, upon the maxim *falsus in uno, falsus in omnibus.* It is enough that we are brought to entertain a reasonable doubt upon the facts in question. It is not like the case of a civil trial, or indeed of any trial, where witnesses may be compelled to attend and undergo a cross-examination. But, on the whole, I think the evidence conclusive that the jurors whose conduct is in question, or one of them, did drink spiritous liquor of some kind.

As remarked by Mr. Justice WOODWORTH, it is impossible to lay down any general rule, which shall guide in all the various circumstances with which cases like this may be attended ; yet I have no hesitation in saying, that where the separation of a jury is contrary to their duty towards the Court, and there is the slightest suspicion of abuse, their verdict should be set aside. The separation here was unusual and unwarrantable. It was perfectly proper for this jury to go out under the care of the constables, and a jury

cannot, in such a case, be always immediately under the eyes of the officers. The purpose is plain for which they were suffered to leave the box. It was not for the purpose of going to their meals; and they received from the Court the usual strict charge as to their demeanor. Yet they departed entirely from the care of the officer, and the instructions they had received, and went a distance of 30 rods, to their lodgings. This was not necessary. It was improper; and I think a separation under these circumstances, in itself, enters with great weight into the cause for granting a new trial, in which we are unanimous.

SAVAGE, Ch. J. I concur in the opinion that a new trial should be granted; and, without recapitulating the evidence, would merely observe, that, in a civil suit, at this day, it is perfectly clear, that a separation of the jury, without, and even contrary to the direction of the Court, would not, of itself, warrant us in setting aside their verdict. The ancient strictness, in this respect, has been much relaxed, as will be seen by the uniform current of modern decisions. Yet, upon so grave a question as that of the life or death of a fellow citizen, I am not prepared to say that the separation of the jury, contrary to the instructions of the Court, and mingling with the throng about the court-house, should not affect their verdict. But I do not deem it necessary for me to express an opinion upon this point, because I think it abundantly proved that these two jurors not only separated from their fellows, and ate and took cakes with them on their return, but that they also drank whiskey. That Lamb also conversed on the subject of the matter in issue, is not fully negatived by Swartwout. He admits that he heard Lamb in conversation on the steps of the jail, he does not know on what subject; but another witness tells us that it related to the trial. This was while Swartwout was at a distance of 5 or 6 rods from Lamb, on the way to the court-house. It is true that the witness who speaks to that conversation, and renders details, has given a different history; but his affidavit is somewhat confirmed by the circumstances stated in Swartwout's affidavit. I think I am warranted from the

proof, in adding to the other misconduct of these jurors, that conversation was held by some bystander, at least with Lamb, upon the subject which he was engaged in trying. It has been properly observed, that there is very great difficulty in laying down a general rule which shall govern in these cases. But I am willing to say, that in no case, where it appears that any of the jury separate from their fellows contrary to the direction of the Court, make use of strong drink, and converse upon the matter which they are impannelled to try, would it be safe to sanction their verdict. The prisoner must be remanded to the county of Steuben, and a new trial had at the next Court of Oyer and Terminer in that county.

Rule accordingly.